Filed 1/9/26  P. v. Noble CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LEON JAMES NOBLE,<br><br>    Defendant and Appellant. | F088094<br><br>(Super. Ct. No. 95CM5500-003)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Valerie R. Chrissakis, Judge.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary and Hannah Janigian Chavez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant Leon James Noble appeals an order denying his petition under Penal Code section 1172.6 to vacate his murder conviction.[1] His conviction stems from the armed robbery of a convenience store in Hanford in 1995 where appellant's confederate Clifton Perry shot and killed the store owner. Both men were charged with special circumstances murder, and the prosecution sought the death penalty. (§ 190.2, former subd. (a)(17)(i).) Appellant and Perry were found guilty of special circumstances murder in 1996 (§ 190.2, former subds. (a)(17)(i), (d); see Prop. 115 as approved by voters, Primary Elec. (June 5, 1990) § 10), but the jury found not true the special allegation that appellant personally used a firearm during the commission of the robbery (§ 12022.5, subd. (a)). At the penalty phase, the jury reached a verdict of death as to Perry and life without the possibility of parole (LWOP) as to appellant.

In 2021, appellant sought relief from his special circumstances murder conviction under section 1172.6. After an evidentiary hearing where the only evidence admitted was the 1996 trial transcript, the trial court found beyond a reasonable doubt that appellant was a major participant who acted with reckless indifference to human life in the underlying robbery, and denied appellant's petition under section 1172.6. On appeal, appellant asserts there was insufficient evidence to support the trial court's findings.

Considering the totality of the circumstances, and viewing the facts in the light most favorable to the judgment, the record discloses substantial evidence from which a reasonable factfinder could conclude appellant was a major participant who acted with reckless indifference to human life. (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) For the reasons discussed below, we affirm the trial court's order denying appellant's petition.

---

[1] All further statutory references are to the Penal Code unless indicated otherwise.

# FACTUAL BACKGROUND

## I. Circumstances of the Robbery

After spending a day drinking with friends and acquaintances at a house in Hanford, appellant and Perry made plans to rob a local convenience store. The store was one they frequented often, and the robbery took place in the evening while the store was still open for business. Several customers and store clerks, including the store owner, were present when appellant and Perry burst into the store and demanded money. Appellant jumped over the counter, hit the teenaged store clerk standing behind the cash register, and proceeded to pull cash from the register. At the same time, Perry fired two gunshots. The store owner (Nasser) came from the back room and confronted Perry, and Perry fired approximately four shots—three of which hit Nasser, ultimately killing him. Perry and appellant ran from the store with cash from the register; they later split the cash, destroyed evidence of the crime, and appellant fled to Ohio the next day.

### A. Events Leading Up to the Robbery

Henry Pridgett went to Elisa Padilla's house in the afternoon of July 9, 1995. When he arrived, appellant, Perry, Paul LeBlanc, Shaundra Stephens and others were there. They were all drinking, and several were smoking marijuana and methamphetamine. Appellant and Perry consumed hard liquor, and Pridgett thought appellant was drunk. He overheard Perry, appellant and LeBlanc talking about robbing a store. Perry indicated he "'need[ed] some N's,'" referring to money, and appellant agreed. Appellant and Perry left the house in Perry's car, and they came back in a maroon- or red-colored car that Pridgett had never seen before. Then they left again and were gone for about 30 minutes. Pridgett did not know exactly where they were going, but he knew they were going to rob a store.

According to LeBlanc, he and Perry went to Padilla's house around noon on the day of the robbery. They went to a nearby store, got some beer, and then came back to the house to drink and hang out. Around 2:00 or 3:00 p.m., appellant paged Perry,

3.

LeBlanc and Perry drove to appellant's house to pick him up, and they all went back to Padilla's house. Appellant and Perry started talking about quick money in the car. The conversation continued when they got back to Padilla's house, and appellant asked Perry if he wanted to "go out and get some money," and Perry said he "was down." LeBlanc told Perry and appellant not to do it, but appellant was saying they should get some money and LeBlanc could not talk them out of it. LeBlanc testified there was no mention of a store while planning the robbery.

According to LeBlanc, they talked about a gun, gloves and bandanas. Perry mentioned getting the bandanas, and he told Stephens to buy them. There was another conversation where Perry noted they needed a different car, and appellant brought up the idea of using his stepmother's car. LeBlanc saw Perry and appellant leave in Perry's car, and Noble came back with a maroon-colored car while Perry returned in his own car. After they returned, Perry told LeBlanc he was going to need his gun, which Perry had given LeBlanc about a week before for safekeeping—the gun was fully loaded and wrapped in a sock. Appellant drove them in the maroon car to LeBlanc's house to get Perry's gun. Only LeBlanc, Perry and appellant knew they were headed to get the gun— Perry told appellant they were going to get his gun. The gun was still loaded with six bullets and wrapped in a white sock when LeBlanc handed it over to Perry. The three drove back to Padilla's house, and LeBlanc got out of the car and went into the house while Perry and appellant left in the maroon car; they were gone for about 15 to 20 minutes.

According to Stephens, who was at Padilla's house that day, Perry arrived at Padilla's house with LeBlanc; later, Perry picked up appellant and brought him back to the house. She recalled both appellant and Perry becoming intoxicated, and appellant drank until early evening. She did not hear any discussion of easy money or robbery. She asked Perry for money to buy some things at the store; he gave her money and told her to buy gloves and red bandanas. She went to a nearby convenience store, bought the

4.

gloves and bandanas, and then she went back to Padilla's house. She heard Perry, appellant and LeBlanc talking in Padilla's bedroom, and LeBlanc was saying not to do it, but she did not know what they were talking about. Appellant and Perry left, and they came back in separate cars—Perry came back in his car, and appellant came back in a red car. Stephens could not remember if LeBlanc was with them or not. Stephens saw the three men leave together on another occasion that afternoon. Later in the evening, Stephens saw appellant and Perry leave the house, but they did not say where they were going, and she did not ask. They took the red car, and Stephens estimated they were gone for about 45 minutes to an hour. While they were gone, Perry's wife came by and asked LeBlanc where they had gone; LeBlanc told her they went to rob a store, and this was the first Stephens had heard about a robbery. Perry's wife left the house before Perry and appellant returned.

Around 9:00 p.m. that night, appellant's stepmother, Wanda Hinton, discovered her car was missing and reported it to the police. She also discovered an extra set of car keys was missing, and she assumed appellant had taken the car.

### B.     The Robbery

S.N., the 15-year old nephew of the Stop and Shop store owner, was working behind the cash register around 9:45 p.m. on July 9, 1995. There were two customers in the store at that time—Alfonso G. and William J., along with S.N.'s coworker and uncle, A.N., and S.N.'s uncle Saeed Nasser, who owned the store. William was at the cash register paying for his purchases, and the cash register was open when a man came into the store and yelled, "'We come for the money, mother fucker.'" S.N. noticed the man wore a red bandana covering his face from the bridge of his nose down, and he wore a beanie on top of his head. It appeared the man had a black gun in his hand, and he reached over the counter and hit S.N. in the head with the gun. S.N. dropped to the floor and, as he did so, he heard two gunshots. He could not identify where the shots came from or who fired them.

After hearing the gun shots, S.N. crawled along the floor—he could see the man who had hit him standing behind the cash register taking money out of it. S.N. estimated the man was about 5 feet 6 inches tall, and was wearing a long, black shirt. As S.N. was crawling away, he heard several more shots and then heard his uncle say something like, "'Oh, no.'" S.N. crawled along the floor to the end of the counter, and then took off running through the door at the back of the store that led to an attached residence. As he went through the door, he saw that his uncle had been shot. S.N. called 911 from the house, and then went back into the store. No one remained in the store except his uncle, whom S.N. helped move to a more comfortable position. Nasser was taken by ambulance to the hospital where he died. About $700–$800 was missing from the cash register.

William J. similarly testified he was at the cash register when a man came running into the store, climbed over the counter, struck S.N. and said, "'I come for the money, you mother-fucker.'" William could not see whether this man had a gun in his hand, but he saw a red bandana covering the man's face. William saw S.N. fall to the floor after the man punched him.

A second, taller man was standing there with a white rag or material over a gun. William did not want to make eye contact with this man because he was worried the man would shoot him. He also had a red bandana on his face, and he said, "'You know what time it is. We just come for the money.'" William then saw Nasser confront the second, taller man and start to strike him. William and A.N. took off running to the back of the store, and William heard gunshots being fired. In total, he heard two series of gunshots: two shots and then, subsequently, three more.

Alfonso, the other customer in the store at the time of the robbery, was ready to grab the items he wanted to purchase when two men rushed into the store demanding money. Nasser was in the back room at the time. One of the men positioned himself in front of S.N. at the cash register, and the other was off to the side. Alfonso tried not to

look at them; he was afraid they would start shooting if he made eye contact. Alfonso saw the man in front of S.N. hit him and fire a gun as S.N. went down—Alfonso thought S.N. had been shot. Like S.N., Alfonso thought the robber had a gun in his hand when he hit S.N. The second man also carried a black gun, and it was not covered with anything. Alfonso observed the two men were wearing bandanas. As soon as he saw the first man shoot at S.N., he saw William and A.N. running from the store, and he ran home and told his wife to call 911. He heard about four or five more gunshots as he was running away from the store.

Beatrice C. lived across the street from the store. That evening, she heard two loud sounds; she opened her bedroom door to see if there was anyone there, and then she heard four or five more loud sounds that she believed were gunshots. She went outside and saw two people coming out of the store; they were close together. The taller of the two stumbled as he pulled off a mask. They got into a car and drove off, and Beatrice ran back into the house and called 911.

C.     Postrobbery Circumstances

According to Pridgett, when appellant and Perry returned to the house, Stephens drove off in the maroon car. Perry and appellant walked to the porch where Pridgett and LeBlanc were standing; Perry told them he had just "gotten his blast on," which Pridgett understood to mean Perry had shot someone. Perry had a red bandana on his face, and he took it off and told Pridgett to burn it. Perry also took empty shell casings out of a handgun, gave them to Pridgett, and told him to throw them away. Then Perry changed his mind and told LeBlanc to take the casings, so Pridgett turned them over to LeBlanc; appellant and Perry told Pridgett to burn appellant's white shoes. Appellant went into the house, and Pridgett burned the bandana and the shoes. Later Pridgett saw appellant and Perry in the bathroom counting their money. After that, Perry turned on the news, which covered the robbery. Perry and appellant shook hands saying that was "'smooth.'" Pridgett left Padilla's house quickly after the news because he heard them talking about

7.

killing him, and he got scared; he left without a shirt because appellant had asked for it earlier.

LeBlanc testified he was still at Padilla's house when Perry and appellant returned. LeBlanc asked Perry what he had done, and Perry told him someone had rushed him, and he shot the "guy." Perry was carrying the gun when he came back to the house, and he unloaded empty shells and handed them to LeBlanc. LeBlanc never saw appellant with a gun. LeBlanc went to the back fence behind the property and started throwing the shells in all directions. LeBlanc saw that Pridgett was burning a rag, and LeBlanc told him to put the fire out. Inside the house, LeBlanc saw appellant counting money in the sink, and Perry was counting money in the living room.

Stephens was outside on the porch steps when appellant and Perry returned in the red car. Appellant asked her to take his mom's car back to his mom's house, and he and Perry would follow behind her. She did what he asked, and when she dropped the car off, appellant's mother was yelling his name, so Stephens got out of the car and started walking. Perry and appellant picked her up a few houses away, and they all went back to Padilla's house. She saw that appellant had money in the bathroom sink. They watched the news, and it indicated police were looking for two Hispanic males in connection with the robbery at the convenience store.

Stephens heard Perry say he had just gone into the store shooting; Perry said, "'Leon, you saw the dude.'" Appellant responded, "'Yeah man, I saw him fall.'" Perry said he "'didn't think [he] shot him,'" but appellant responded, "'Man, I think you shot him in the leg.'" She also heard Perry say he did what he had to do; she had heard him say on a previous occasion that he "guessed he was just a natural born killer." Stephens saw some money in the bathroom sink that appellant had taken out of his pockets, but she was not sure if that was money from the robbery. She had seen Perry with a gun, which he carried from the house, but she never saw appellant with a gun. Everyone at the house agreed they should keep their mouths shut, and Perry told appellant he should leave town.

8.

Later that night, appellant told Stephens he had jumped over the counter during the robbery and was grabbing money out of the cash register when Perry came up behind him; appellant heard gunfire and saw someone fall to the ground. Appellant wondered aloud why Perry had come into the store shooting.

Hinton testified she saw a "'girl'" drive up to her house in Hinton's car around 10:00 or 10:30 p.m., park it, and the young woman started walking down the street. Hinton and her sister got in her sister's car and drove down to street to ask the woman about appellant's whereabouts. At that time, another car pulled up with appellant in it; Hinton's sister went over to that car and asked appellant to give back the keys to Hinton's car, which he did. A dispatcher indicated Hinton called the police at 10:03 p.m. saying that her stepson had come home with the car.

The next day, on July 10, 1995, appellant called Sherry Beeman and asked for a ride to buy a bus ticket. Beeman picked appellant up at Padilla's house, and she purchased a ticket with money appellant had given her. Later that day, Beeman drove appellant to pick up his daughter. After that, she agreed to take him and his daughter to the bus station. On the way, they stopped at a market, and appellant purchased a newspaper that contained a story about the robbery that he read out loud in the car. He did not say whether he had been involved.

According to Deanna Jefferson, the mother of appellant's daughter, appellant contacted Jefferson the day after the robbery and said he was taking their daughter to the mall to go shopping. Appellant told Jefferson he had been involved in a shooting, but his role was limited to jumping over the counter and taking money at a liquor store. He said he was wearing gloves and a mask. He told her he was in a "daze," and could not believe he had done this. After he left with their daughter, appellant called Jefferson and told her that he was taking their daughter to his mother's house in Ohio.

9.

## D. Police Investigation

A.A. worked at the Family Market—another convenience store in the area—and knew Nasser. He visited with Nasser's relatives at their house after Nasser died. They told A.A. two men who wore red bananas and gloves had killed Nasser, and A.A. remembered a young woman had purchased red bandanas and gloves at his store a few hours before the robbery. S.A. was working at the Family Market in July 1995, and he had read about the robbery and murder at the Stop and Shop in the newspaper. He remembered selling red bandanas and gloves to a young woman who was a regular customer—he identified Stephens at trial.

Sheriff's deputy Lee Reynolds interviewed LeBlanc who said that after the robbery, Perry handed Leblanc six empty shell casings and told LeBlanc to get rid of them. Based on this interview, police searched the yard of Padilla's house. On top of a wood pile, Reynolds found burned clothing and a .357-caliber Ruger revolver wrapped in a shirt. The burned clothing included fragments of two brown gloves and remnants of a red bandana. Reynolds also recovered a shell casing from a neighbor of Padilla's, who found it in her driveway. A search of Perry's car revealed a pair of gloves inside the trunk.

Deputies recovered several bullet casings and fragments in the Stop and Shop. The bullet recovered from Nasser and bullet fragments recovered at the scene matched the bullets test fired from the Ruger revolver found at Padilla's house.

Deputy Greg Lewis interviewed appellant on July 16, 1995, in Ohio after appellant was arrested. Appellant admitted his participation in the robbery, but said he had no idea whether they were going to rob a store or a person; he did not know they were going to that particular store. Appellant told Lewis that he and Perry had first agreed appellant would be the driver, but since appellant did not "drive good," Perry told him he would do everything if appellant would just get the money. He and Perry drove up to the convenience store, turned off the lights to the car but kept the engine running. They

10.

waited in the car a minute because they saw someone coming out of the store. After that person was gone, they got out of the car, peeked around the corner and saw people coming out of the store. Appellant told Lewis that scared him, and he told Perry they should "forget" it. According to appellant, Perry told him to "'Stop being a pussy.'"

Appellant and Perry proceeded inside the store; appellant ran in and jumped over the counter to make sure they did not have an alarm. He pushed if clerk in front of the cash register out of the way—he did not hit the clerk. Appellant heard the first gunshot as he was coming inside the store, and he saw the gun in the air. He heard yelling, but he was getting money from the register, so he was not paying any attention.[2]

E.     Appellant and Perry's Trial Testimony at the Penalty Phase

Neither appellant nor Perry testified at the guilt phase of their trial, but they both testified during the penalty phase. The parties' stipulated that Perry had several juvenile adjudications involving assault with a deadly weapon and attempted robbery. He was also convicted of robbery as an adult, and he admitted using a firearm—a Daisy BB gun, which was a replica of a sawed off shotgun. The victim of this robbery testified during the penalty stage. The parties also stipulated appellant had a juvenile adjudication for assault likely to produce great bodily injury, and as an adult he had been convicted of inflicting corporal injury on a spouse/cohabitant.

Appellant testified that on the day of the robbery, he'd had a lot to drink. He did not know a robbery was going to take place, but that was how the evening "progressed." They discussed his role to some extent, which included appellant jumping over the counter and getting some money. He did not have a gun, and he never intended for anyone to get hurt. He heard shots being fired during the robbery, but he kept his head down hoping he would not get hit with bullets. He did not know if anyone was shooting

---

**2**      Additional excerpts of appellant's interview were played for the jury, but nothing indicates that exhibit was included with the trial transcript submitted to the trial court for the evidentiary hearing under section 1172.6.

at him.  Appellant was "[n]ot really" aware that someone had been shot at the time he left the store; but he had heard the gunshots and had seen someone fall.

Appellant had known the people who ran the Stop and Shop as he had gone in there "a lot."  He first learned someone had died during the robbery "maybe the same night of the incident," but it was not until the next morning that he read about it in the newspaper while on the way to the bus station.  He was trying to confirm whether it was true that someone had died.  His recollection of the robbery remained "kind of blurry" because he had been drunk at the time, but he remembered it somewhat.  He had driven the car to the robbery, but he was too intoxicated.  He got the gloves and the bandana from Perry, but denied any knowledge of where Perry got them.  He was unsure when he first saw the gun that day, but he thought the first time was when he and Perry were in the car at the store.  He was with Perry and LeBlanc when they went to LeBlanc's house to get the gun, but he "didn't really know if it was for no gun."  He first saw the gun when Perry pulled it out from under the seat in the car in front of the store.  He heard from someone that the gun "was ready to go."

He walked up to the store wearing the bandana and gloves.  He told the "dude" at the counter to get down, and that they were there for the money.  The person at the counter did not get down, so appellant pushed him down, jumped over the counter and got the money.  He was unaware of what else was going on in the store because there was a lot of chaos; although he heard gunshots, he was unaware of who was firing because he kept his head down at the register.  He did see someone fall when the shots were fired, but it was a "blur."  The person who fell to the floor was moving, so appellant thought nothing was wrong with him.  He was trying to go as quickly as he could at the register because bullets were flying.

Although appellant told a deputy that Perry had told him to look under the cash register for money, appellant denied Perry ever said that—appellant was simply telling the deputy whatever might get himself out of trouble.  When the shooting was over,

12.

appellant ran out of the store. Appellant denied discussing anything in the car with Perry after the robbery. Appellant admitted he had told the deputy in his postarrest interview that Perry told appellant that "'if anybody tried to stand in his way, he was going to shoot him[,] even[] the police,'" but appellant denied Perry actually said that.

When he and Perry got back to Padilla's house, appellant took his clothes off and gave them to someone. He remembered watching news coverage of the robbery, but denied he and Perry pounded their fists together when they watched it. He admitted emptying money into the sink, and he and Perry split the robbery proceeds in half. He admitted Perry told him to go home with his family, but denied Perry meant that he should get out of town.

Perry testified that on the day of the robbery, he and others were talking about needing money and they decided to commit a robbery. When they left to commit the robbery, they had not talked about any particular place to rob. Perry admitted that he had LeBlanc get the gun, and denied appellant ever had a weapon that night. Perry denied they took appellant's stepmother's car for purposes of the robbery, and Perry stated it was his decision to pick the Stop and Shop to rob—it was his idea to commit the robbery because he was "broke" and "frustrated." Perry believed appellant was drunk at the time—appellant could not drive the car; they had stopped to get some gas before the robbery, and appellant almost hit the gas pump.

Perry drove around for about 10–15 minutes with appellant, going to three different stores, but they had too many people. Perry ultimately selected the store, and he parked the car where there was no lighting. Appellant went into the store first, and Perry followed him about two seconds later; appellant did not have a gun. Appellant said something to let people know it was a robbery, and then appellant jumped over the counter and hit S.N. over the head with his right hand, knocking S.N. down. When S.N. fell, appellant fell too. Perry confirmed he told appellant to reach under the tray in the cash register to see if there was money under it. Perry could not see much because he

had his face down, he had a baseball hat on, and the bandana covered his face up to the bridge of his nose. He heard someone come up behind him and felt himself being grabbed. At that time, the gun was by his side, but when the person reached for Perry, he brought the gun up and started firing. It was never the plan to shoot anyone; the gun "was just there for the pressure," and Perry had never checked to see if it was loaded.

When they got back to Padilla's after the robbery, it was LeBlanc's idea to burn the clothes; LeBlanc and Pridgett burned the clothes, shoes, and bandanas, and LeBlanc got rid of the shell casings. Perry hid the gun behind Padilla's house where police later found it.

## II.  Procedural Background

Appellant and Perry were charged with murder, robbery and conspiracy. The murder charge included a special circumstances allegation the murder was committed during the course of a robbery, and enhancement allegations both personally used a firearm during the murder. In May 1996, a jury found appellant and Perry guilty of murder (§ 187, subd. (a)) and second degree robbery (§§ 211, 212.5, subd. (c)). The jury found Perry, but not appellant, had personally used a firearm during the commission of the crimes. (§ 12022.5, subd. (a).) It also found, as a special circumstance as to each defendant, that the murder occurred during the commission of a robbery (§ 190.2, former subd. (a)(17)(i).)[3] After a separate penalty phase of the trial, the jury returned a verdict of death for Perry, and LWOP for appellant. The court sentenced appellant to LWOP on the murder count, and to the middle term of four years for the robbery, staying execution of that sentence under section 654.

_____

[3]     The jury was instructed, in relevant part, that if it found "that a defendant was not the actual killer of a human being or if you are unable to decide whether the defendant was the actual killer or an aider and abett[o]r, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant, with reckless indifference to human life and as a major participant aided, abetted, counseled or assisted in the commission of the crime of robbery which resulted in the death of a human being, namely, Saeed Nasser."

14.

In July 2021, appellant petitioned the court to vacate the murder conviction under what is now section 1172.6, arguing he could not presently be convicted of murder given the changes in the law under Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). An evidentiary hearing was held in February 2024 where the only evidence submitted was the 1996 trial transcript. The issue presented was whether, in view of clarifying case law issued by the California Supreme Court, defendant was a major participant in the underlying felony who acted with reckless indifference to human life and thus could still be convicted of murder under section 189, subdivision (e)(3), despite that he was not the actual killer. After hearing arguments, the trial court took the matter under submission, and ultimately denied the petition by written order on April 3, 2024.[4]

## DISCUSSION

### I.     Senate Bill 1437 and Section 1172.6

Senate Bill 1437 was enacted "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) Senate Bill 1437 amended section 188, which defines malice, and section 189, which defines the degrees of murder to address felony-murder liability. (Stats. 2018, ch. 1015, §§ 2–3.)

Section 188 now provides that, "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person solely based on his or her participation in a crime." (*Id.*, subd. (a)(3).) The change reflects the Legislature's intent

---

[4]     In August 2021, proceedings were stayed in the trial court pending a decision by the California Supreme Court regarding the jury's special circumstance findings; the stay was lifted after the California Supreme Court issued its opinion in *People v. Strong* (2022) 13 Cal.5th 698.

that "[a] person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (Stats. 2018, ch. 1015, § 1, subd. (g).)

Senate Bill 1437 also added section 189, subdivision (e), to the Penal Code, which limits the circumstances under which a person may be convicted of felony murder: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) [defining first degree murder] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (*Ibid.*)

In Senate Bill No. 775 (2021–2022 Reg. Sess.), effective January 1, 2022, the Legislature amended the language of what is now section 1172.6 to, among other things, expand the scope of the petitioning procedure to include individuals convicted of attempted murder or manslaughter under a theory of felony murder or the natural and probable consequences doctrine. (Stats. 2021, ch. 551, §§ 1, 2; Legis. Counsel's Dig., Sen. Bill No. 775 (2021–2022 Reg. Sess.).) Under the amended statute, if the petitioner has made a prima facie case for relief, the court "shall issue an order to show cause." (§ 1172.6, subd. (c).) Within 60 days after the order to show cause has issued, the trial court must hold a hearing "to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.…" (*Id.*, subd. (d)(1).)

"At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the

16.

petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

## II.    Standard of Review

"Ordinarily, a trial court's denial of a section 1172.6 petition [following an evidentiary hearing] is reviewed for substantial evidence." (*People v. Reyes, supra*, 14 Cal.5th at p. 988; accord, *People v. Emanuel* (2025) 17 Cal.5th 867, 885 (*Emanuel*).)

"In reviewing the trial court's findings for substantial evidence, we apply well-settled principles. 'We "'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the necessary fact] beyond a reasonable doubt.'" [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make

17.

determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt.'" (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480 (*Oliver*); accord, *People v. Reyes, supra*, 14 Cal.5th at p. 988.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the [factfinder] … to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403; see *People v. Mumin* (2023) 15 Cal.5th 176, 197 ["'if an appellate court identifies a reasonable alternative interpretation based on its own review of the evidence, it does not necessarily compel reversal, because an appellate court need not be convinced of a defendant's guilt beyond a reasonable doubt'"; the question is whether a factfinder "'could have found the defendant guilty beyond a reasonable doubt'"].) Reversal is not warranted unless "'"upon no hypothesis whatever is there sufficient substantial evidence to support [the trial court's ruling]."'" (*People v. Cravens* (2012) 53 Cal.4th 500, 508; accord, *People v. Thomas* (2023) 14 Cal.5th 327, 378.)

## III. Substantial Evidence Supports the Trial Court's Findings

Before the enactment of section 189, subdivision (e)(3), the California Supreme Court provided new guidance as to the major participant and reckless indifference to human life standards under section 190.2, subdivision (d), in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). When the Legislature subsequently added section 189, subdivision (e)(3), pursuant to Senate Bill 1437 and expressly incorporated section 190.2, subdivision (d), it presumptively imported the guidance articulated in *Banks* and *Clark* as to the major participant and reckless indifference standards. (*People v. Strong, supra*, 13 Cal.5th at p. 710.) To guide our consideration of whether there was substantial evidence to support the trial court's finding that appellant was a major participant who acted with reckless indifference to

human life, we begin with a summary of the relevant legal background, including *Banks* and *Clark*, and the underpinnings for those decisions.

## A. The *Enmund-Tison* Continuum

In *Banks*, the California Supreme Court held that section 190.2, subdivision (d), was designed to codify the holding in *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), which articulates the constitutional limits on executing felony murderers who did not personally kill. (*Banks, supra*, 61 Cal.4th at p. 794.) *Banks* explained *Tison* and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*), "collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Banks, supra*, at p. 794.) As such, section 190.2, subdivision (d) (and, in turn, § 189, subd. (e)(3)) must be accorded the same meaning. (*Banks, supra*, at p. 794.)

At one end of the continuum is *Enmund*, where the defendant's culpability did not meet the constitutional minimum for the death penalty. (*Enmund, supra*, 458 U.S. at p. 801.) There, the defendant identified a robbery victim, planned the crime, and drove armed confederates to the home of the victims. (*Id.* at p. 784; *id.* at p. 803 (dis. opn. of O'Connor, J.).) The confederates shot and killed the robbery victims, and Enmund acted as a getaway driver and helped dispose of the weapons. (*Id.* at pp. 784–787.) The high court held the Eighth Amendment bars the death penalty for any felony-murder aider and abettor "who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Enmund, supra*, at p. 797.) "The intent to commit an armed robbery is insufficient; absent the further 'intention of participating in or facilitating a murder' ([*Enmund, supra*,] at p. 798), a defendant who acts as 'the person in the car by the side of the road at the time of the killings, waiting to help the robbers escape' (*id.* at p. 788) cannot constitutionally be sentenced to death." (*Banks, supra*, 61 Cal.4th at p. 799.) The high court reversed Enmund's death sentence as prohibited by the

federal Constitution, concluding Enmund was a "'"minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state."'" (*Banks, supra*, at p. 800.)

*Tison* lies at the other end of the continuum, where the defendants' conduct was deemed death-penalty eligible under the federal Constitution. In *Tison*, three brothers (Ricky, Raymond and Donald Tison) assisted their father, Gary Tison (who had killed someone in a previous escape attempt) and his cellmate in breaking out of prison, bringing a large arsenal of weapons with them to the prison. (*Tison, supra*, 481 U.S. at pp. 139–140.) In the ensuing escape, "their car, already down to its spare tire, suffered another flat, so the five men agreed to flag down a passing motorist in order to steal a replacement car. Raymond waved down a family of four; the others then emerged from hiding and captured the family at gunpoint. Raymond and Donald drove the family into the desert in the Tisons' original car with the others following. Ricky and the cellmate removed the family's possessions from their car and transferred the Tison gang's possessions to it; Gary and his cellmate then killed all four family members. When the Tisons were later apprehended at a roadblock, Donald was killed and Gary escaped into the desert, only to die of exposure. [Citation.] Ricky and Raymond Tison and the cellmate were tried and sentenced to death. The trial court made findings that Ricky and Raymond's role in the series of crimes was "'very substantial'" and they could have foreseen their actions would "'create a grave risk of … death.'"" (*Banks, supra*, 61 Cal.4th at pp. 799–800 [summarizing the facts of *Tison*].)

Guided by *Tison* and *Enmund*, the *Banks* court considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant …." (*Banks, supra*, 61 Cal.4th at p. 794.) There, Banks and two other men attempted to rob a medical marijuana dispensary. During the attempted robbery, shots were fired and the three fled. When a security guard attempted to stop them, Banks shot him twice, killing him. (*Id*. at p. 795.) Matthews was acting as the getaway driver,

20.

driving the three to the dispensary, waiting for them, and then picking up two of them after the failed robbery and driving them away.  (*Id*. at p. 805.)  In comparing and contrasting the factors the United States Supreme Court had considered in *Tison* and *Enmund*, our high court concluded Matthews was not a major participant in the robbery: there was no evidence of Matthews's role in the planning or procuring of weapons; there was no evidence any of them had previously committed murder, attempted murder, or any other violent crime; Matthews was not present when the shooting took place, and there was no evidence he instigated or could have prevented the shooting.  (*Banks, supra*, at p. 805.)

The court further found Matthews did not act with reckless indifference to human life:  although Matthews knew he was participating in an armed robbery, there was no evidence he "knew his own actions would involve a grave risk of death.  There was no evidence Matthews intended to kill or, unlike the Tisons, knowingly conspired with accomplices known to have killed before.  Instead, as in *Enmund*, Banks's killing of [the security guard] was apparently a spontaneous response to armed resistance from the victim."  (*Banks, supra*, 61 Cal.4th at p. 807.)

In *Clark*, the California Supreme Court examined the scope of reckless indifference to human life.  There, Clark was involved in the attempted robbery of a computer store.  Clark "was the mastermind who planned and organized the attempted robbery and who was orchestrating the events at the scene of the crime."  (*Clark, supra*, 63 Cal.4th at p. 612.)  During the robbery, one of Clark's confederates shot and killed the mother of a store employee who arrived at the store to pick up her son.  At the time of the shooting, Clark was not at the store, but he drove to the location shortly thereafter and fled when he saw a woman lying on the ground, the police approaching, and the shooter fleeing the scene.  (*Id*. at pp. 537–542, 612–613.)

21.

Clark was convicted of first degree felony murder, and true findings were made on the robbery-murder and burglary-murder special circumstance allegations based on his aiding and abetting liability in the shooting. (*Clark, supra*, 63 Cal.4th at pp. 608–610.) To decide whether Clark was a major participant in the robbery, the court reviewed the factors discussed in *Banks*, but did not decide whether Clark was a major participant because it held the evidence was insufficient to show reckless indifference to human life. (*Clark, supra*, at p. 614.)

In reaching this conclusion, the court expanded on factors relevant to the reckless indifference to life analysis: there was only one gun at the scene of the killing, it was not carried by Clark and it was loaded with only one bullet; as Clark was not present at the scene, there was no evidence he had an opportunity to intervene to prevent the killing; Clark's departure was ambiguous as to his mental state concerning the victim's death, and Clark knew police were arriving to aid the victim; the period of interaction between the perpetrators and the victims was designed to be limited; no evidence was presented that Clark knew the shooter had a propensity for violence, and, as he was not at the scene, he had no opportunity to observe the shooter's conduct that might have indicated the shooter was likely to engage in lethal violence; and, finally, there was evidence Clark had taken some steps at the planning stage to minimize the risk of violence during the robbery—the robbery was undertaken after closing time, there were not supposed to be any bullets in the gun, and the gun was actually loaded with only one bullet. (*Clark, supra*, 63 Cal.App.4th at pp. 618–623.)

In *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*), our high court again revisited section 190.2, subdivision (d). There, the defendant planned an unarmed robbery and assault of a man (Wilson) who had swindled the defendant out of money. (*Scoggins, supra*, at p. 671.) Pursuant to the plan, two of Scoggins's friends (Powell and Howard) would hide inside a van, and then they would jump out and assault Wilson. (*Ibid.*) Scoggins was not going to be present at the scene or participate in the attack, and there

was no evidence the plan involved the use of weapons. (*Ibid.*) In executing the plan, however, Powell pulled out a gun and fired several shots and killed Wilson; Powell and Howard got into the van and drove away. (*Id.* at p. 672.) Scoggins, meanwhile, waited at a gas station nearby, but exchanged numerous phone calls with Powell and Howard in the hour before the shooting. (*Ibid.*) After the shooting, Scoggins walked over to Wilson, spoke with bystanders and participated in a police interview at the scene. (*Ibid.*)

The court held that Scoggins did not act with reckless indifference to human life: Scoggins did not use a gun, nor did he know one would be used; his plan did not involve shooting Wilson; he was not physically present at the crime scene and was not in a position to restrain Powell once the meeting with Wilson began; Scoggins's view of the scene was obstructed, so he was unaware in real time that Powell was deviating from the original plan; although he was in contact with Powell and Howard by phone, he lacked control over their actions once they arrived on the crime scene, especially given how quickly the shooting occurred; there was no evidence Scoggins instructed his confederates to kill Wilson, or that he directed them to deviate from the plan once they arrived at the crime scene; Scoggins's return to the scene after the shooting reflected ambiguity as to his mindset—it could be inferred that Scoggins walked back to the crime scene because he was unsurprised by the shooting; alternatively, he might have intended to check on Wilson and render aid; the duration of the interaction between the perpetrators and the victim was very limited; and there was no evidence Scoggins knew that either Powell or Howard was likely to use lethal force. (*Scoggins, supra*, 9 Cal.5th at pp. 680–681.)

Most recently, in *Emanuel*, our high court considered the reckless indifference standard in the context of section 1172.6. (*Emanuel, supra*, 17 Cal.5th at pp. 885–896.) There, Emanuel and a confederate planned an unarmed robbery where they would meet the victim in a public park in the afternoon and steal his stash of marijuana. When the victim resisted the heist, Emanuel told his cohort, "'let's go'" (*id.* at p. 891), and started

to walk away, but his confederate shot and killed the victim. (*Id.* at pp. 877, 878.) The trial court denied the petition, finding Emanuel was a major participant in the robbery who acted with reckless indifference. The trial court emphasized Emanuel should have done more to prevent the shooting. The appellate court affirmed, and a petition for review was granted. (*Id.* at p. 881.)

Our high court held the facts before it did not support a finding Emanuel carried out the crime with the requisite reckless indifference to human life within the meaning of section 189, subdivision (e)(3). The court highlighted that Emanuel was not armed, and he did not know his confederate was armed or likely to use deadly force—all facts unsupportive of a finding of reckless indifference. (*Emanuel, supra*, 17 Cal.5th at p. 885.) The crime unfolded quickly without any prolonged period of restraint—the short length of the interaction did nothing to heighten the risk of violence beyond that inherent in the robbery itself. (*Id.* at p. 886.) The robbery took place during the day in a public place, circumstances which did not support an objective risk of lethal violence that would have been reasonably anticipated by Emanuel. (*Id.* at p. 889.) When the victim unexpectedly resisted the robbery, Emanuel attempted to act as a restraining influence on his confederate by trying to abandon the plan, which the court found to be "crucial" insights into Emanuel's state of mind. (*Id.* at p. 891.) The court emphasized that it was not incumbent upon a defendant to actually prevent the violence or attempt to do so by any means to demonstrate a lack of a recklessly indifferent mindset, nor does the failure to restrain a cohort weigh in favor of reckless indifference without some evidence the defendant had a meaningful opportunity to do so. (*Ibid.*) Finally, the court found Emanuel's fleeing the scene and failing to aid the victim to be ambiguous as to his mental state—it could have reflected a lack of concern for the victim, or a desire to avoid arrest, or both. (*Id.* at p. 894.) Standing on its own, Emanuel's failure to aid the victim and fleeing was insufficient to demonstrate reckless indifference.

24.

With this legal backdrop in mind, we turn to the question of whether the trial court's finding that appellant was a major participant who acted with reckless indifference to human life is supported by substantial evidence.

### B.     Analysis

#### 1.     Major Participant

The major participant element focuses on "the defendant's *personal* role in the crimes leading to the victim's death .…" (*Banks, supra*, 61 Cal.4th at p. 801.) To be a major participant, the "defendant must have been actively and substantially involved in the events leading up to [the] murder." (*Ibid.*) The defendant's "personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder .…" (*Id.* at p. 802.) To aid in this assessment, *Banks* articulated the following considerations:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)  "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid*.)  Yet, "[a]ll may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major' [citations]." (*Ibid.*)

Considering the record in the light most favorable to the judgment, the trial court's finding appellant was a major participant is supported by substantial evidence.  On the first *Banks* factor—the defendant's role in planning the crime—there is substantial evidence that appellant played a primary planning role.  He made statements to Perry that

he needed money, which LeBlanc testified is what "really ignited the situation." According to LeBlanc's testimony, appellant asked Perry if he wanted to go out and get some money, and Perry said he was "down," which LeBlanc re-emphasized "really started things." Also, according to LeBlanc, appellant and Perry discussed the details of the robbery, including obtaining the gun, gloves and bandanas. During the planning, appellant offered the use of his stepmother's car when Perry indicated they needed to use another car, and he knowingly drove Perry and LeBlanc to pick up Perry's gun.

Appellant argues the evidence shows he agreed only to the robbery and nothing more, and it was Perry who directed all the preparations and indicated they needed a different car. While the testimony might have been susceptible to an interpretation that Perry orchestrated the planning with appellant only passively agreeing to his plans, viewing the testimony in the light most favorable to the judgment, as we must, LeBlanc and Pridgett's testimony indicated appellant played a substantial role in instigating the decision to commit a robbery and developing the plan to do so. (*People v. Collins* (2025) 17 Cal.5th 293, 307 [substantial evidence review requires evaluating the whole record "'in the light most favorable to the judgment below'"].)

LeBlanc, who was directly involved in the conversations between appellant and Perry about the robbery, heard them talking about "quick money" while driving to Padilla's house after picking up appellant initially. Once back at Padilla's house, LeBlanc testified appellant brought up the issue of coming up with money; appellant asked Perry whether he wanted to go out and get some money, and Perry said he was "down." According to LeBlanc, appellant and Perry discussed what they were going to do, and they talked about related items, including the gun, gloves and bandanas. Perry indicated they needed another car, which he and appellant discussed, and it was appellant who suggested they use his stepmother's car. A reasonable trier of fact could conclude that appellant initiated discussion of a robbery and was an active participant in planning it, not simply that he stood by silently while Perry made the plans and agreed to

26.

participate. (*People v. Alexander* (2010) 49 Cal.4th 846, 883–884 [under substantial evidence review standard, reviewing court does not consider whether there is evidence to support a contrary finding, but whether substantial evidence supports the trial court's choices between conflicting evidence and reasonable inferences arising from such evidence].)

As to the second factor—appellant's role in supplying or using lethal weapons— appellant drove Perry and LeBlanc to get the gun; LeBlanc testified Perry told appellant they were going to get the gun. In that respect, appellant did *assist* in supplying Perry with the weapon—but it was Perry's gun, and Perry arranged with LeBlanc to get it. Moreover, the trial court found appellant was not armed during the robbery. There is some evidence under this factor that provides support for the major participant finding.

The third factor—the defendant's knowledge of the particular dangers posed by the nature of the crime, the weapons used, or past experience of conduct of the other participants (*Banks, supra*, 61 Cal.4th at p. 811)—supports the major participation finding. (See *id.* at p. 808 ["Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies the constitutional minimum."].) The plan involved targeting a convenience store that was open for business at the time of the robbery with an unknown number of employees and customers inside. Perry was to keep everyone in the store compliant and obedient with the gun while appellant would empty the cash register. There was no plan to minimize the number of people in the store or wait until it was closed, and the trial court discredited Perry's statements they tried to find a store with fewer people in it.[5] With the possibility of multiple people in the store, there was a far

---

[5] The trial court attributed these statements to appellant, but it was Perry who claimed they drove around trying to find a store with fewer people in it.

27.

greater chance of resistance and a deadly confrontation given Perry's loaded gun, especially as Perry and appellant easily could be outnumbered.

Appellant maintains there is insufficient evidence to show that he was aware of any particular dangers posed by the nature of the crime as it was nothing more than a "garden variety armed robbery of a convenience store." He emphasizes that he was not armed, when he punched S.N. at the register it was not particularly severe, and appellant did nothing to stop S.N. or anyone else from fleeing the store. Appellant highlights his statements to Stephens after the robbery expressing confusion as to why Perry "'c[a]me in shooting'" at the store, and he emphasizes his postarrest statements indicating he was trying to extricate himself from the plan before the robbery, but Perry was pressuring him to go forward.

The fact that appellant knew Perry was armed and they planned an armed robbery does not, *in itself*, show there was an elevated risk to human life beyond those risks inherent in any violent felony. (*Clark, supra*, 63 Cal.4th at p. 623.) However, the robbery here involved an even greater risk to human life: they planned to rob a convenience store, at gunpoint, that was open for business with potentially multiple customers and employees inside—greatly increasing the chance for resistance and a lethal response. This was not planned as an unarmed robbery of a single person at a public park in the middle of the day (*Emanuel, supra*, 17 Cal.5th at pp. 877–878), nor was it a robbery of a single liquor store employee dropping the day's receipts at the bank after the store was closed (*In re Taylor* (2019) 34 Cal.App.5th 543, 547). In each of these cases, the circumstances of the plans did not pose a heightened risk of death the defendants would have appreciated: in *Emanuel*, the defendant was unaware his confederate had a gun, and the public setting and daylight hours lessened the likelihood the confederate would resort to deadly force (*Emanuel, supra*, 17 Cal.5th at p. 889), and the evening setting and isolation of the victim in *Taylor* decreased the likelihood of

28.

resistance and a deadly response, especially since it was inconclusive whether the defendant had knowledge his confederate would carry a gun (*Taylor, supra*, at p. 558).

More generally, appellant's contentions present only an alternative view of the evidence. The substantial evidence standard does not permit us to assess which evidence is more persuasive, or whether we would have reached the same finding as the trier of fact had we been standing in its shoes. (*People v. Burney* (2009) 47 Cal.4th 203, 253 ["'"'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.'"'"'"].) Pointing to contrary evidence that could have given rise to inferences more favorable to appellant does not undercut the substantial evidence supporting the trial court's findings.

On this factor, the trial court also found appellant knew before the robbery that Perry had a propensity for violence. The trial court highlighted appellant's statement to Deputy Lewis that when appellant saw people coming out of the store, he wanted to back out of the robbery, but he was worried Perry might turn on him. The court reasoned that while appellant claimed to have been reluctant to follow through with the robbery, his conduct both prior to and during the robbery "showed that he was aware of and appreciated [the] gravity of Perry's dangerousness."[6] The court also reasoned appellant's lack of reaction (and sole focus on the cash register) when Perry fired the gun at two separate intervals during the robbery supported its conclusion appellant was aware Perry would use the weapon during the robbery. The court explained appellant's "singular focus on getting money from the register despite the chaotic scene with bullets flying

---

[6] Although appellant indicates Perry made threats against appellant to secure his participation, appellant said the following about the pressure Perry exerted: appellant said, "man, forget this, you know. I'm trying to get out of it now, but, you know, the pressure that [Perry] had on me was like if I wasn't to trip with him, you know, he might even go—he might even get me, you know. 'Cause, you know, he was saying things like, "Stop being a pussy," you know, and stuff like that.'"

around him is inconsistent with a person claiming to be unaware that his co-defendant would start shooting."

Appellant argues his fear of Perry and his admission that he thought Perry might shoot him did not support the trial court's conclusion that appellant knew of Perry's dangerousness. Rather, appellant maintains, his admission meant he committed the robbery under duress and felt he had no choice; he maintains he was not required to put himself in harm's way to prevent a robbery.

Although the trial court credited appellant's statement that he became apprehensive about the robbery but feared Perry would turn on him if he backed out, the court did not draw an inference this apprehension caused appellant to commit the robbery unwillingly. Appellant testified many of his statements to Deputy Lewis were lies designed to "get [him]self out of trouble," his defense strategy at trial did not involve any argument he did not willingly commit the robbery and, during his penalty-phase testimony, appellant said nothing about feeling pressured to continue. Instead, appellant testified he agreed to participate in the robbery of his own accord. Moreover, appellant's conduct during the robbery, which the trial court emphasized, could be viewed as inconsistent with someone participating unwillingly or under coercion. He was the first one to enter the store, started yelling they were there for the money, and engaged immediately in violence to get access to the cash register. He stayed singularly focused on his task, despite the chaos, and appeared unfazed when Perry began firing the gun. Although the trial court credited appellant's statement of his misgivings about Perry and the robbery, given the evidence, it was not required to infer that appellant was an unwilling participant in the robbery.

Further, the trial court could reasonably infer from appellant's fears about Perry that appellant knew he had a propensity for violence. They were friends; they did not come together only for purposes of the robbery. From appellant's apprehensions about what Perry might do to *him*, the court could reasonably infer appellant knew and believed

Perry might use lethal force *on others* during the robbery. And, as the trial court pointed out, appellant's unfazed conduct during the robbery was inconsistent with claiming he did not know there was a likelihood Perry would start shooting. (*People v. Maury, supra*, 30 Cal.4th at p. 396 ["An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence."].)

Considering the fourth factor—appellant's presence at the scene, whether he was in a position to facilitate or prevent the actual murder, and whether his own actions or inactions played a particular role in the death (*Banks, supra*, 61 Cal.4th at p. 803)—evidence supports the major participant finding. Appellant was present for the entire course of the robbery; and he was the first to use violence (by hitting S.N.) to effectuate the robbery, which increased the risk of a deadly confrontation. Indeed, the evidence indicated Perry fired a couple of shots about the same time that appellant was hitting S.N.—appellant's blow caused S.N. to fall to the floor, and Alfonso thought S.N. had been shot. By striking S.N., Nasser's teenaged nephew, in conjunction with the gunfire, there was evidence to infer this precipitated Nasser physically confronting Perry, leading Perry to shoot him in a separate, second series of shots. When appellant heard the gunshots that killed Nasser, appellant later admitted he saw someone go down, but he focused on emptying the till and then he and Perry fled to the car. Although the evidence does not suggest appellant had a particularly meaningful opportunity to prevent the murder between the first and second series of gunshots, appellant's initial instigation of violence could be reasonably viewed as one of the key circumstances that precipitated the deadly confrontation between Nasser and Perry.

Finally, the fifth factor—what appellant did after lethal force was used (*Banks, supra*, 61 Cal.4th at p. 803)—provides substantial evidence to support the major participant finding. There is evidence appellant knew someone had been shot at the time of the robbery—he testified he saw someone go "down," but he simply finished emptying the cash register and fled with Perry. (See, e.g., *In re Harper* (2022) 76 Cal.App.5th 450,

31.

462–463 (*Harper*) [evidence that after hearing but not seeing the gunshot, the defendant carried stolen goods away from the crime scene that weighed in favor of a major-participant finding].) He and Perry split the money in half, suggesting they were full partners in the robbery. There is evidence appellant took steps to destroy or conceal evidence once he was back at Padilla's house, as Pridgett burned his shoes, and appellant asked for Pridgett's shirt. Perry testified at trial that they all tried to cover up the robbery and the murder. After the robbery, Perry told appellant to get out of town, and appellant bought a bus ticket to Ohio the next day. (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 591 [full partners at every stage of the crime, including splitting proceeds equally with shooter, supported major participant finding].)

### *Totality of the Circumstances*

Considering the evidence in the light most favorable to the judgment and presuming in support the existence of every fact that could reasonably be deduced from the evidence, substantial evidence supports the finding that appellant's participation "'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major' [citations]." (*Banks, supra*, 61 Cal.4th at p. 803.) Importantly, there is substantial evidence appellant played a substantial role in instigating and planning an armed robbery of a convenience store, and was present for, and integrally participated in, all stages of the crime, including its execution and disposing of evidence afterwards. (*Oliver, supra*, 90 Cal.App.5th at p. 483 [presence during the planning and physical presence during execution of the crime facilitated its completion and supported major participation finding].)

Importantly, the store selected for the robbery was open for business with multiple customers and employees inside, of which appellant was aware, and substantially heightened the grave risk of death beyond that inherent in any violent felony. (See *In re McDowell* (2020) 55 Cal.App.5th 999, 1013–1014 [where assailants will be outnumbered, there is a greater chance of resistance].) Appellant entered the store

knowing Perry was armed—it was planned as an armed robbery—and he knew Perry had a propensity for violence and was likely to use lethal force: he had fears for his personal safety as it pertained to Perry, and appellant was seemingly unfazed by the shooting during the robbery. Appellant played a vital role in facilitating the robbery, and he was the first to instigate violence, which a reasonable factfinder could infer increased the risk of resistance and precipitated the deadly confrontation between Perry and Nasser. Afterward, appellant split the proceeds evenly with Perry, covered up evidence of the crime, and fled the state, suggesting he was a full and equal partner in the crime.

### 2. Reckless Indifference to Human Life

We next consider whether appellant acted with the requisite mental state, examining the record for "sufficient evidence of ""reasonable, credible, and of solid value"" to 'support a finding beyond a reasonable doubt'" that appellant acted with reckless indifference. (*Clark, supra*, 63 Cal.4th at p. 618; accord, *Emanuel, supra*, 17 Cal.5th at p. 885.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Even where the evidence considered is primarily circumstantial, if "the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*Id.* at p. 358.)

To determine whether a defendant acted with reckless indifference to human life, we "look to whether a defendant has '"knowingly engag[ed] in criminal activities known to carry a grave risk of death."'" (*Banks, supra*, 61 Cal.4th at p. 801.) "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Ibid.*) Although "'there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless

33.

indifference to the value of human life'" (*Clark, supra*, 63 Cal.4th at p. 615, quoting *Tison, supra*, 481 U.S. at p. 158, fn. 12), such as "'the manufacture and planting of a live bomb,'" armed robbery is not among them (*Clark, supra*, at p. 615, quoting *Banks, supra*, at p. 810, fn. 9). "Reckless indifference 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.'" (*Scoggins, supra*, 9 Cal.5th at pp. 676–677, quoting *Clark, supra*, at p. 617.)

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, '"[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."' [Citations.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death"' satisfies the statutory requirement." (*Scoggins, supra*, 9 Cal.5th at p. 677; accord, *Emanuel, supra*, 17 Cal.5th at p. 884.)

In *Clark*, the court articulated the following considerations for determining whether a defendant acted with reckless indifference to human life: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of

violence during the felony?" (*Scoggins, supra*, 9 Cal.5th at p. 677 [listing factors set forth in *Clark, supra*, 63 Cal.4th at pp. 618–623].) These questions "aid in distinguishing those who knowingly engage in criminal activities known to carry a grave risk of death from other felony perpetrators .…" (*Emanuel, supra*, 17 Cal.5th at p. 884.)

The reckless indifference considerations "'significantly overlap'" with the major participant considerations, "'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.'" (*Clark, supra*, 63 Cal.4th at p. 615.) As with the major participant considerations, "'[n]o one of [the reckless indifference] considerations is necessary, nor is any one of them necessarily sufficient.'" (*Id.* at p. 618.) "We analyze the totality of the circumstances to determine whether [the defendant] acted with reckless indifference to human life." (*Scoggins, supra*, 9 Cal.5th at p. 677.)

### Duration of the Crime

*Clark* explained that courts "have looked to whether a murder came at the end of a prolonged period of restraint of the victims by [the] defendant." (*Clark, supra*, 63 Cal.4th at p. 620, fn. omitted.) "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Ibid.*) Here, the trial court considered this factor to be neutral. The robbery did not involve a prolonged period of restraint like that in *Tison*—either in planning or in execution—and there is no evidence relevant to this factor that supports the reckless indifference finding.

### Awareness or Use of Weapons
### and Knowledge of Cohort's Propensity for Violence

As it pertains to evidence of appellant's awareness of the presence of weapons and his knowledge of Perry's propensity for violence (*Clark, supra*, 63 Cal.4th at p. 621), appellant did not use a gun himself, but he knew Perry was armed with a loaded gun.

Testimony established appellant was present and involved in the planning, which included discussion of obtaining a gun. Appellant drove Perry and LeBlanc to LeBlanc's house to get Perry's gun; Perry told appellant they were going to get the gun. Additionally, appellant conceded he knew about the gun before they entered the store. LeBlanc confirmed the gun was loaded when he received it from Perry, and it was loaded when he gave it back to Perry that night. Moreover, appellant remembered someone saying the gun was "ready to go," implying it was loaded.

As already discussed, there is substantial evidence to infer appellant knew of Perry's propensity for violence before the robbery, and his conduct during the robbery was consistent with knowledge Perry was likely to use lethal force. (*Clark, supra*, 63 Cal.4th at p. 621 ["A defendant's knowledge of factors bearing on a cohort's likelihood of killing are significant to the analysis of reckless indifference to human life."].) Appellant's awareness that Perry was armed and his appreciation of Perry's dangerousness is substantial evidence supporting the reckless indifference finding.

### *Physical Presence at the Scene and*
### *Opportunity to Restrain Confederate and/or Aid the Victim*

Substantial evidence shows appellant was present for the entire course of the robbery. He immediately resorted to violence when he ran inside the store, hitting S.N. and knocking him down. At almost the same time, the evidence showed Perry fired two shots. There was evidence to infer the gunshots coupled with S.N. being knocked to the ground precipitated Nasser confronting Perry, and resulted in Perry firing a second round of shots, ultimately killing Nasser. Although no evidence suggests there was a meaningful opportunity for appellant to restrain Perry between the first and second rounds of shots, appellant was the first to use physical violence during the crime where he knew his cohort was armed. Rather than trying to reduce the risk of death during the robbery, which was already grave under the circumstances, appellant's conduct inflamed the situation by immediately resorting to physical violence, increasing the risk of

36.

resistance and a lethal reaction by his armed cohort. (*Clark, supra*, 63 Cal.4th at pp. 619–620 [considering presence, opportunities to restrain the crime and/or aid the victim in assessing a defendant's mental state].)

In arguing the evidence under this factor does not support a reckless indifference finding, appellant emphasizes his postarrest statements that Perry was putting pressure on him to commit the robbery.[7] He also argues the evidence shows he did not hit S.N. very hard, he allowed S.N. to crawl away, and permitted the other clerk and the two customers to run out of the store without trying to stop them. In this regard, appellant argues, he restrained or mitigated the risk of lethal violence.

We disagree. The trial court did not infer from appellant's statement to Deputy Lewis that appellant was coerced or otherwise committed the robbery unwillingly. Additionally, while there is no evidence appellant actively tried to keep customers or employees from fleeing, this does not obviate that by initiating violence at the outset of the crime, appellant heightened the risk of death under these circumstances, and ultimately aided in precipitating the lethal confrontation between Perry and Nasser. In examining the record for substantial evidence, the issue is not whether there is evidence in the record to support a *different* finding or to draw different inferences, but whether there is some evidence that, if believed, support the findings of the trier of fact. (See *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 233 [""""If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.""""].)

We agree with appellant that his actions *after* the robbery offer no substantial evidence to support the reckless indifference finding. (*Scoggins, supra*, 9 Cal.5th at

---

**7** Appellant maintains Perry threatened him, but appellant's statement to Deputy Lewis regarding the pressure he felt from Perry did not reference any threats.

p. 679 ["A defendant's actions after the shooting may also bear on the defendant's mental state."].) Appellant fled with Perry after he shot Nasser as soon as appellant finished emptying the cash register, providing no aid to Nasser. Under the circumstances, appellant's flight from the store without aiding the victim was ambiguous as to his mental state. Appellant knew others had been present for the shooting and could summon aid for Nasser, and nothing in appellant's conduct after Nasser was shot isolated Nasser or would have prevented or delayed him from receiving aid. (*Emanuel, supra*, 17 Cal.5th at p. 894; cf. *Tison, supra*, 481 U.S. at pp. 140–141 [the defendants abandoned the victims in a remote desert and disabled their only available chance of survival evidenced reckless indifference]; cf. *Harper, supra*, 76 Cal.App.5th at pp. 457, 465 [after hearing gunshot, the defendant did nothing to aid the manager, and left him hidden away in a bathroom where he was unlikely to be found quickly].)

On balance, however, appellant's presence and immediate resort to violence that precipitated the deadly confrontation is substantial evidence supporting the reckless indifference finding.

### *Efforts Taken to Minimize the Risk of Violence*

As for minimizing the risk of violence, efforts at the planning stage to minimize the potential for violence may, but do not necessarily, bear on reckless indifference. Given the two-part nature of the reckless indifference standard, "'[t]he existence of efforts to minimize violence does not necessarily foreclose a finding of reckless indifference to human life .…'" (*Emanuel, supra*, 17 Cal.5th at p. 888, quoting *Scoggins, supra*, 9 Cal.5th at p. 682.) "Where an 'objective evaluation of the circumstances' of the crime suggests the risk of violence is grave, the defendant's apparent efforts to minimize that risk may be unavailing." (*Emanuel, supra*, at p. 888, quoting *Scoggins, supra*, at p. 683.) "Conversely, the absence of such efforts does not necessarily evince a subjective disregard for risk where the objective circumstances of the planned crime suggest the risk

38.

of violence posed is no more than that inherent in any violent felony." (*Emanuel, supra*, at p. 888, citing *Scoggins, supra*, at p. 679.)

Here, a factfinder could reasonably conclude the circumstances of the crime objectively posed a heightened risk to life that appellant disregarded. Although appellant denied the robbery plans made at Padilla's house involved a store, Pridgett heard the group discussing plans to rob a store; and Stephens heard LeBlanc telling Perry's wife he had gone to rob a store, indicating a store was the target before Perry and appellant left Padilla's house. The armed robbery scheme hatched at Padilla's involved targeting a public-facing business during its business hours—a time when multiple employees and customers were likely to be (and, ultimately, were) present. In contrast, the plan in *Scoggins* called for multiple accomplices to assault a single victim in a public parking lot in broad daylight with no weapons. (*Scoggins, supra*, 9 Cal.5th at pp. 671–672.) And, in *Clark*, the plan was to rob a retail store after business hours when few employees would be present using a single, unloaded gun. (*Clark, supra*, 63 Cal.4th at p. 623.)

Moreover, in contrast to *Emanuel*, which involved a mid-day robbery near a public park where only one victim would be confronted by two assailants, orchestrating the compliance of multiple people in a confined space (who would likely outnumber Perry and appellant) at loaded gunpoint objectively posed a grave risk to human life. Unexpected customers could arrive at any moment, which increased the risk of resistance (or a panicked reaction) leading to lethal violence. Given the evening timeframe and being inside the confines of a building, there would not be witnesses outside the range of the gun who could easily identify the robbers in the event of a shooting—which would tend to exacerbate, not mitigate, the risk of lethal violence.

Despite that appellant was involved in the planning at Padilla's house and had the opportunity to consider both the objective risk to life the plan posed and how those elevated risks could be minimized, appellant took no steps to ameliorate those risks. For example, appellant took no steps to ensure the gun they planned to use was unloaded,

plan the robbery for a time when customers would be absent, or wait until the customers were gone. As the plan involved could be reasonably viewed as posing an objectively grave risk to human life beyond those inherent in any violent felony, appellant's failure to take any steps to minimize the risk of violence at the planning stage provides evidence to conclude he subjectively disregarded the risks. This evidence supports the reckless indifference finding.

### *Appellant's Age (22)*

As recently observed in *Emanuel*, appellate courts have recognized that "'a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to life.'" (*Emanuel, supra*, 17 Cal.5th at p. 885, fn. 6, quoting *In re Moore* (2021) 68 Cal.App.5th 434, 454 (*Moore*) & citing *People v. Ramirez* (2021) 71 Cal.App.5th 970, 990–991 (*Ramirez*).) In *Moore*, the defendant and two others (Russell and Winston) stole a car and drove through a mall parking lot until they spotted a victim getting out of his car with his fiancée and sister. (*Moore, supra*, at pp. 440–441.) Russell got out of the car and robbed the victim and his fiancée at gunpoint and then, without provocation, fired two shots at the victim, killing him. (*Id.* at pp. 441–442.) The defendant was 16 years old at the time of the crime. (*Id.* at p. 454.) The court concluded there was insufficient evidence to support a reckless indifference finding in light of the defendant's age. Holding that a defendant's youth is a relevant factor in determining whether a defendant acted with reckless indifference to human life, the court reasoned that the defendant, at age 16, lacked ""'"the experience, perspective, and judgment"'"" to adequately appreciate the risk of death posed by his criminal activities. (*Ibid.*)

In *Ramirez*, someone other than the defendant had instigated and planned a carjacking, provided the gun and fired it, killing the victim. (*Ramirez, supra*, 71 Cal.App.5th at pp. 976–978.) In concluding there was insufficient evidence to support a reckless indifference finding, the court reasoned the fact the defendant was 15 years old at the time of the shooting "greatly dimishe[d] any inference he acted with reckless

disregard for human life .…" (*Id.* at p. 990.) He was influenced by peer pressure; and he was afraid of the shooter, who was a gang member. The court observed the defendant's "age may well have affected his calculation of the risk of death posed by using the firearm in the carjacking, as well as his willingness to abandon the crime." (*Id.* at p. 991.)

By contrast, in *Harper*, the court concluded a 16-year-old's youth at the time of the offense did not undermine the finding that he acted with reckless disregard for human life. (*Harper, supra*, 76 Cal.App.5th at pp. 466–472.) The court reasoned the evidence showed the defendant willingly participated in the robbery despite knowing there was a very high likelihood the victim would die; his conduct during the robbery and his statements afterwards demonstrated his callousness or indifference to whether the victim lived or died; and all of this showed "he did not act like an immature, naïve, or impulsive adolescent," and in "no way" undermined the substantial evidence indicating he was a major participant in the robbery who acted with reckless disregard for human life. (*Id.* at p. 472.)

Here, appellant was 22 years old when he committed the crimes, and the trial court expressly considered appellant's age in assessing reckless indifference. The court explained there was little evidence that appellant's age at the time of the offense made him unaware of the particular dangers posed by the nature of the crime, weapon used, or past experience or conduct of other participants. The court pointed out appellant was not a juvenile "under the undue influence of his co-defendant who could not appreciate his conduct."

There is substantial evidence that appellant initiated discussions about money and precipitated the plan to commit a store robbery. He was an active participant in the planning, offering his stepmother's car, and driving Perry to get the gun. The robbery was not committed on the spur of the moment or engaged in out of sheer impulsivity; it was planned and required multiple, intermediate steps, such as obtaining the gun, the

41.

gloves and bandanas, and the car—all of which took time. During the planning conversations, LeBlanc was actively trying to persuade them *not* to commit the robbery, providing appellant with reasons for caution and an opportunity for reflection. Appellant was not a juvenile who is even more likely to succumb to peer pressures or the influence of others, and he was urged to reconsider the plan. (See *Oliver, supra*, 90 Cal.App.5th at p. 489 ["Presumably, the presumption of immaturity weakens as a defendant approaches 26."].)

In sum, the evidence shows appellant had time to think about his participation; consider the details and scope of the plan and the danger of lethal violence it posed; and assess LeBlanc's counsel *not* to commit the robbery. Appellant emphasizes trial testimony that could support a different conclusion, but we do not reweigh the evidence under the substantial evidence standard of review, or consider whether the evidence could support different inferences or conclusions. (*People v. Thomas, supra*, 14 Cal.5th at p. 379.)

### *Totality of the Circumstances*

The circumstances strike us as a close case on the issue of reckless indifference, especially for the trier of fact. However, the role of the appellate court under the substantial evidence standard is different from the factfinder. Even if we could conclude the circumstances might be reconciled with a contrary finding as to appellant's mental state, it does not warrant reversal of the judgment. (*People v. Zamudio, supra*, 43 Cal.4th at p. 358.) Viewing the facts in the light most favorable to the judgment, and considering the totality of the circumstances, there is substantial evidence from which a reasonable factfinder could conclude appellant acted with a recklessly indifferent mindset. (*Id.* at p. 357 [appellate court reviews the whole record to determine whether *any* rational trier of fact could have found elements of a crime or special circumstance beyond a reasonable doubt].)

There is substantial evidence appellant played an integral part in planning, executing and covering up the armed robbery of a convenience store. The plan could be reasonably viewed as objectively posing a grave risk of death because it involved holding at gunpoint multiple customers and employees inside a store open for business, which appellant disregarded. There was substantial evidence appellant knew the plan involved a convenience store before the crime was initiated; that Perry would be armed; and that Perry's gun was loaded. Nothing in the plans mitigated the associated risks, such as ensuring the gun was unloaded, robbing the store after hours or waiting until there were no customers present. Moreover, there was evidence appellant knew of Perry's propensity for violence, and that Perry would likely resort to lethal violence if necessary.

Appellant was present inside the store for the entire robbery, and he instigated the violence by hitting S.N. immediately upon entering the store. A reasonable factfinder could conclude that appellant failed to take any steps to restrain the crime and instead escalated the probability of lethal violence, despite knowing his confederate was armed and dangerous. (*McDowell, supra*, 55 Cal.App.5th at p. 1014 ["A defendant is more culpable when he does nothing to avoid violence despite having time to reflect and consider his options."].) In addition, appellant's conduct, in concert with Perry shooting the gun, could be reasonably viewed as a factor that precipitated the lethal confrontation between Nasser and Perry. Rather than acting as a restraining force during the robbery, a rational factfinder could conclude from the circumstances that appellant's violent conduct right at the outset of the crime increased the risk of resistance and a lethal confrontation.

Moreover, while there is little to suggest appellant had a meaningful opportunity to restrain Perry between the first and second set of shots, the trial court found he appeared unfazed by the shooting and stayed focused only on the cash register despite that Perry started shooting. Appellant's reaction could give rise to a reasonable inference that appellant was unsurprised by Perry firing the gun, and that he was unconcerned by

43.

Perry's decision to start shooting—suggesting he was indifferent to whether anyone was killed.

There is also substantial evidence from which the trial court could reasonably conclude appellant's relative youth did not affect the formulation of a recklessly indifferent mental state. Appellant was a young adult, not a juvenile who is more susceptible to the pressures of others. The crime was not spontaneous—it was a planned crime where appellant was involved in planning the details from beginning to end, including offering and obtaining his stepmother's car for the robbery and driving Perry to obtain the gun. The crime was not committed impulsively, and there was time for reflection and an opportunity to reconsider. For example, LeBlanc tried to talk Perry and appellant out of the robbery, providing an opportunity for appellant to reflect on the plan and weigh his options before the robbery was set into motion.[8]

Considering the totality of the circumstances, there is substantial evidence to support the finding appellant acted with reckless indifference to human life.

---

[8] We acknowledge an LWOP sentence may be viewed as severe for a young adult under the age of 26, especially one who was not the actual killer, but it is the Legislature's prerogative to set the penalty for a crime; it is not for us to pass judgment on the desirability of its policy choices. (See *People v. Turnage* (2012) 55 Cal.4th 62, 74 [Legislature's prerogative and duty to define degrees of culpability and punishment]; see also *People v. Hardin* (2024) 15 Cal.5th 834, 864–865 [in the context of an equal protection challenge to § 3051, rational bases support Legislature's decision not to offer young adults convicted of special circumstance murder a youth offender parole opportunity, but noting that extinguishing "any hope of release, particularly for an individual just past the cusp of adulthood, is a form of retribution that exacts its own price—one borne not just by the individuals involved, but by their families, by their communities, and by society as a whole" (fn. omitted)].)

44.

## DISPOSITION

The trial court's order is affirmed.

MEEHAN, J.

WE CONCUR:


LEVY, Acting P. J.


PEÑA, J.